UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:06CV-591-H

CHURCHILL DOWNS INC., *et al.*                                          PLAINTIFFS


V.


ODS TECHNOLOGIES, L.P. d/b/a                                          DEFENDANT
TELEVISION GAMES NETWORK

**MEMORANDUM OPINION AND ORDER**

Churchill Downs Incorporated and associated entities (collectively "Churchill Downs" or

"Plaintiffs") have sued ODS Technologies ("ODST") d/b/a the Television Games Network

("TVG") for violating a series of contracts between the parties, along with associated causes of

action.  TVG has moved to dismiss.  For the reasons stated below, the Court will deny the

motion.

I.

In March 1997, Plaintiffs and TVG entered into a Founder's Agreement (the "Founder's

Agreement"), which granted TVG the exclusive, world-wide rights to broadcast horse races

sponsored and/or conducted by Churchill Downs, and to accept wagers on those races.  The

initial term of this contract was five years.  The Founder's Agreement included a provision

requiring that "[a]ny public announcements of, or relating to, the matters contemplated by this

Agreement will be subject to the review and approval by Churchill Downs and ODST and their

mutual agreement on the form and content of any such announcements."  The Founder's

Agreement also included a provision stating that "[n]either this Agreement nor any of the rights

or obligations of either party hereunder may be assigned, in whole or in part, without the prior

written consent of the other."  There is no apparent dispute that, under the Founder's Agreement,

TVG was free to license its programming to third party multichannel video programming

distributors (MVPDs), such as cable operators like Comcast and Time Warner, and digital

satellite providers like DirecTV and Dish Network.

Over the course of the Founder's Agreement, Churchill Downs grew dissatisfied with the

pace of TVG's expansion, both domestically and internationally.  The Founder's Agreement was

subsequently amended by letter on February 29, 2000 (the "Letter Amendment").  The Letter

Agreement gave Churchill Downs the right to "permit the non-exclusive sale, resale, or other

broadcast of video signals of its races outside of races and simulcasting facilities, and the

acceptance of accounts, in markets where TVG is not deployed."  The Letter Amendment set two

important limitations on this right, however.  It required that any such agreements between

Churchill Downs and a third party be on a "nonexclusive" and that Churchill Downs use its "best

efforts to enter into agreements of not more than one year."  As applied to Churchill Downs

racing, the Founder's Agreement and Letter Amendment apparently expired on March 14, 2007.

However, the agreement regarding Arlington Race Track does not expire until August of this

year; the agreement as to Calder Race Track extends to April of 2008.

On December 5, 2005, Churchill Downs and TVG officials held a meeting to discuss

TVG's plans to expand its offerings internationally.  At that meeting, Churchill Downs alleges

that Ryan O'Hara, President of TVG stated that "TVG's expansion would come from the United

States domestic market, and it was not actively considering any international expansion."

Complaint at ¶ 18.

On January 9, 2006, Churchill Downs entered into an agreement (the "Racing U.K.

Agreement") with Racing U.K. and Magna Entertainment Corporation ("MEC").  The object of this agreement was to develop a subscription channel to be branded as "Racing World," which would broadcast races into the United Kingdom and Ireland from Churchill Downs, MEC racetracks, and other interested racetracks.  The agreement was for a three-year term and was to be "exclusive (other than TVG)", according to the contract.  Churchill Downs claims that it has invested more than $750,000 in this venture.  Racing World began broadcasting in March 2006.

On October 26, 2006, TVG made a public announcement that it had signed a "long-term reciprocal agreement" ("the ATR Agreement") with At The Races ("ATR"), for ATR to become TVG's "exclusive broadcast partner in the UK" in concert with The Racing Network International ("TRNI").  ATR's multi-platform business includes the United Kingdom and Ireland's "most watched dedicated horseracing channel," as described in the announcement of the ATR Agreement.  TRNI is an American company that would facilitate bets placed in the United Kingdom and Ireland on American racing.  Churchill Downs officials allegedly called David Nathanson, Senior Vice President and General Manager of TVG Network, around the time of this announcement, and Nathanson allegedly stated that TVG intended to broadcast Churchill Downs video as part of the ATR venture.

Churchill Downs filed this lawsuit on November 20, 2006.  Churchill Downs makes four claims for relief: for anticipatory and actual breach of contract, for breach of the covenant of good faith and fair dealing, for promissory estoppel, and for declaratory relief.  More specifically, Churchill Downs alleges that the ATR Agreement violated the Founder's Agreement in at least two ways.  First, Churchill Downs alleges that the October 26, 2006 announcement violated the public announcement provision of the Founder's Agreement.

3

Second, Churchill Downs alleges that the ATR Agreement constitutes an improper assignment or sublicense.  Churchill Downs also alleges that Ryan O'Hara's statement at the December 5, 2005 meeting that TVG "was not actively considering any international expansion"  supports a claim of promissory estoppel.

II.

Defendant TVG has moved to dismiss this action under Rule 12(b)(6).  A motion to dismiss pursuant to Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998); accept all the complaint's factual allegations as true, *id.*; and determine whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Court may not grant such a motion to dismiss based upon a disbelief of a complaint's factual allegations.  *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).  Rather, the Court must liberally construe the complaint in favor of the party opposing the motion and may dismiss the case only where no set of facts could be proved consistent with the allegations which would entitle the plaintiff to a recovery. *Hishon v. Spalding*, 467 U.S. 69, 73 (1984); *Miller*, 50 F.3d at 377.

The Founder's Agreement states that it will be governed by Delaware law.  However, Kentucky courts do not always honor choice of law provisions.  *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000).  Although the parties agree that Delaware law governs this dispute, the Court still must determine whether that choice is appropriate. *See, e.g., American Farm Mortgage Co., Inc. v. AG America,* 232 F.Supp.2d 721, 724 n.5 (W.D. Ky. 2002).  The Sixth Circuit has held that Kentucky courts would apply the Restatement (Second)

4

of Conflict of Laws as the framework for analyzing contractual choice-of-law provisions.

*Wallace Hardware*, 223 F.3d at 397. Section 187(2) of the Restatement provides that a choice of

law provision will be enforced unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the law of § 188, would be state of the applicable law in absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Laws* § 187(2). ODST is a Delaware corporation and so

clearly the choice-of-law clause meets the Restatement test. Therefore the Court will apply the

substantive law of Delaware as necessary.

III.

One of the main questions in this case is the exact nature of the ATR Agreement: is it an

assignment, a license, a sub-license, or something else? The Founder's Agreement specifically

states that "[n]either this Agreement nor any of the rights or obligations of either party hereunder

may be assigned." The Complaint, however, alleges that the ATR Agreement was either an

improper assignment or sublicense. The Court is unable to find – and Churchill Downs fails to

allege – any portion of the Founder's Agreement that explicitly forbids licensing or sublicensing.

TVG for its part contends that the ATR Agreement was not an assignment and was in fact a

licensing agreement fully contemplated by and in compliance with the Founder's Agreement.

TVG further argues that Churchill Downs' claim for breach of contract must be based on one of

two theories: either that the ATR Agreement constituted an "assignment" of TVG's rights to

ATR and TRNI, or that the term "nonassignable" in the Founder's Agreement impliedly

5

prohibited sublicensing.

Under Delaware law, assignment is "a legal term having an unequivocal, accepted definition." *Baxter Pharmaceutical Products, Inc. v. ESI Lederle*, 1999 WL 160148 at *5 (Del. Ch. Mar. 11, 1999). The Delaware Chancery Court in *Baxter Pharmaceutical Products* adopted the Restatement (Second) of Contract definition of an assignment: "[A]n assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such a performance." *Restatement (Second) of Contracts* § 317 (1981). *See also Baxter Pharmaceutical Products, Inc.,* 1999 WL 160148 at *5 n.16.

Plaintiffs cite *Motorola, Inc. v. Amkor Technology, Inc.*, 849 A.2d 931 (Del. 2004) for the proposition that the terms "license" and "assignment" are ambiguous and open to interpretation. Plaintiffs' argument is unavailing. *Motorola* involved a contract where *in the context of the contract at issue*, the Delaware Supreme Court found that "the terms 'license' and 'assignment' are ambiguous." *Id.* at 933. The contract was to be interpreted under Illinois law. *Id.* at 936. The contract at issue in *Motorola* had sections discussing both licenses and assignments. *Id.* The Delaware Supreme Court found that the trial court improperly constructed the assignment section "in apparent isolation" from the licensing section, violating the strictures of Illinois contract law interpretation. *Id.* at 938. Therefore, the court's conclusion rested not upon what "assignment" meant in isolation, but rather upon the juxtaposition of "license" and "assignment" in the same contract, and the appropriate conclusions to draw from that contract.

Here, unlike *Motorola*, there is no "license" portion of the contract at issue (the Founder's Agreement). There is only a statement that neither the rights nor obligations under the

6

contract may be assigned. Although the *Baxter Pharmaceutical Products* case is unpublished and does not come from the highest court of the state, it appears to be the clearest statement from a Delaware court on the meaning – in isolation in a contract – of the term "assignment." Therefore, this Court will follow the definition of assignment laid out in Restatement (Second) of Contracts § 317.

IV.

Irrespective of the applicable law, one difficulty with sustaining the ODST motion is that Churchill Downs has not received a complete copy of the ATR Agreement and it does not know precisely the actions that ODST has taken. Therefore, it is not in a position to argue effectively exactly how ODST may have violated the Founder's Agreement.

Depending on the precise terms of the ATR Agreement and the plans for implementing its provisions, it could be difficult to determine whether ODST has crossed the definitional line between licensing and assigning. More important, it would be somewhat unfair to require Churchill Downs to make an effective argument without such information. Therefore, the Court must deny ODST's motion to dismiss at this time.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion to dismiss is DENIED.

cc:     Counsel of Record